**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **SARRA G. WILKINS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Case No.: 1:26-1733** |
| | ) |
| **FITNESS INTERNATIONAL, LLC, d/b/a** | ) |
| **LA FITNESS AND D/B/A XSPORT** | ) |
| **FITNESS,** | ) |
| | ) |
| **Defendant.** | ) |

## COMPLAINT

NOW COMES, Plaintiff, SARRA G. WILKINS, by and through her undersigned Attorneys, the Law Offices of GOLDMAN & EHRLICH, CHTD., and as their Complaint against Defendant, Fitness International, LLC, d/b/a LA Fitness and d/b/a XSport Fitness, states as follows:

### NATURE OF THE ACTION

This is an action arising from unlawful employment practices committed by Defendant in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq.,* and for breach of contract under Illinois common law.

### JURISDICTION, VENUE, AND PARTIES

1. Plaintiff invokes the jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331 and § 1367.

2. Venue is proper because Defendant conducts business in the Northern District of Illinois and the acts giving rise to this action occurred herein.

1

3. Plaintiff, Sarra G. Wilkins, was employed by Defendant as a personal trainer beginning on or around May 3, 2024.

4. Defendant, Fitness International, LLC, d/b/a LA Fitness and d/b/a XSport Fitness, is a limited liability company organized under the laws of the State of Illinois and at all relevant times owned and operated a gym located at 3030 N. Broadway Street, Chicago, Illinois 60657 (the "Facility").

5. On May 23, 2025, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") regarding the conduct described herein. The EEOC assigned Charge No. 480-2025-04091. On November 21, 2025, the EEOC issued Plaintiff a Notice of Right to Sue, informing Plaintiff that she must file suit within ninety (90) days if she wished to pursue her claims in court.

### FACTUAL BACKGROUND

6. On or around May 3, 2024, Plaintiff interviewed for a personal trainer position at the Facility. During the interview, supervisor John Allen offered Plaintiff the position on the spot due to Plaintiff's exemplary qualifications, and Plaintiff accepted the offer that same day.

7. Plaintiff's duties included assisting gym members in achieving their fitness goals through personalized workout programs, professional instruction, and motivational support. At all relevant times, Plaintiff met or exceeded Defendant's legitimate job performance expectations.

8. Later in May 2024, there was an incident immediately outside the Facility in which supervisor Allen got into a physical altercation with his brother, which resulted in the death

2

of Allen's brother. Allen was detained by police as a result of the incident but ultimately released. Allen then took a month of leave from the Facility.

9. Allen returned to his position at the Facility in June 2024. Upon his return, he had a meeting with all the trainers at the facility, including Plaintiff, and told them that he "killed" his brother in self-defense.

10. Beginning in June 2024, Plaintiff's supervisor, Allen, repeatedly asked Plaintiff personal questions of a sexual nature, including:

    a. "That guy that you're working out with, how long have you been seeing him?

    b. "Are you guys hooking up, or are you seeing him?"

    c. "Are you just having sex?"

    d. "Has this been going on while I have been gone?"

    e. "Word around the gym is that you are a player."

11. Plaintiff objected to Allen's questions of this nature and informed Allen that such inquiries were unprofessional and unrelated to her job duties. After Plaintiff objected, Allen insisted that she had to discuss these matters with him.

12. Around this time, Allen and Plaintiff were having a conversation during which Allen conspicuously craned his head to "check out" a female gym member. Plaintiff said that it was inappropriate, and Allen responded that it was fine because he could check out female gym members "subtly." Allen then said to Plaintiff, "watch this," and proceeded to distract the room with a loud conversation with another trainer so that he could observe a female gym member walking by without craning his head. Plaintiff expressed further discomfort with Allen's actions and walked away.

3

13. Also, around this same time, Plaintiff was informed by gym members that Allen had made them feel "uncomfortable."

14. On or around July 29, 2024, Allen asked Plaintiff to speak with him privately. During this conversation, Allen instructed Plaintiff to sit down and berated her about whether she had obtained a certain training certification, which was not due until mid-August 2024.

15. During this incident, another trainer approached Plaintiff and Allen, and Allen started discussing a different matter with that trainer. Plaintiff reasonably understood that her conversation with Allen was finished and began walking away from Allen.

16. When Plaintiff walked away, Allen became visibly upset, slammed his hands on a desk in a physically threatening manner, and shouted, "what is your problem," and "why do you keep doing this?"

17. Plaintiff then requested that the conversation continue in the presence of another staff member due to Allen's threatening behavior and because Plaintiff feared for her safety.

18. Facility Operations Manager, Laura Huber, witnessed the interaction between Plaintiff and Allen and instructed Allen to calm down.

19. Plaintiff, Huber, and Allen then moved to a private room within the Facility. Plaintiff informed both individuals that Allen had made her uncomfortable on multiple occasions by asking questions of a sexual nature and that she intended to file a formal complaint with Defendant's human resources department.

20. Huber asked Allen to leave the room so that she could speak privately with Plaintiff. Huber told Plaintiff that she would assist her and ensure that a complaint was filed with Defendant.

21. Minutes later, Facility Manager Casey Kiourkas informed Plaintiff that Defendant had decided to "go a different direction" and that it would be Plaintiff's last day of employment.

4

22. Kiourkas then ordered Plaintiff to leave the Facility and instructed her that she was prohibited from returning to any LA Fitness location for ninety (90) consecutive days because she was listed as "fired/terminated" in Defendant's system.

23. Immediately following this incident, Plaintiff contacted Defendant's Regional Manager Adrian Otiz and requested to file a complaint regarding the incident and her termination.

24. During that conversation, Otiz admitted that Plaintiff should not have been terminated under these circumstances and stated that Defendant's human resources department would contact Plaintiff so that she could file a formal complaint.

25. A few days later, Plaintiff followed up with Otiz via text message to inquire about the status of her personal training clients. Otiz responded that Defendant would "take care of them" and again assured Plaintiff that human resources would reach out to her.

26. Despite these assurances, weeks passed and Plaintiff was never contacted by Defendant's human resources department or any other representative of Defendant.

27. On or around August 30, 2024, Plaintiff received a notification of a missed call from Huber. Shortly thereafter, Plaintiff received a text message from Huber stating, "Hey girl I just wanted to reach out and let you know I haven't forgotten about you and that I just wanted to check in and see how things are going. Make sure that you're healing from all the trauma that was caused, yeah girl I'm just checking in on you."

28. Later that evening, Plaintiff spoke with Huber by phone. During that call, Huber informed Plaintiff that Otiz had gone to the Facility to assist Allen and Kiourkas in "properly" terminating Plaintiff in Defendant's computer system so that no "red flags" would appear.

29. On or around December 10, 2024, Plaintiff again contacted Huber via text message to ask whether she was still willing to help Plaintiff pursue her complaint. Huber responded, "of course."

30. On or around January 3, 2025, Plaintiff attempted to contact Defendant's human resources department directly after still having received no outreach.

31. That same day, Plaintiff also attempted to contact Huber and other former employees of Defendant to obtain human resources contact information but received no response.

32. On or around January 21, 2025, Plaintiff independently obtained a phone number for Defendant's human resources department. Plaintiff called the following day and spoke with an HR representative, who provided an email address for further correspondence.

33. On or around February 3, 2025, Plaintiff submitted a formal complaint to Defendant's human resources department. After receiving no response, Plaintiff submitted a second complaint on or around February 11, 2025. Plaintiff received no further correspondence from Defendant since she filed the EEOC charge, as referenced in Paragraph 5.

34. As a result of Defendant's actions, Plaintiff has suffered severe and ongoing emotional distress for which she has sought therapy. She received a diagnosis of anxiety in December 2025 and a diagnosis for post-traumatic stress disorder (PTSD) in January 2026.

35. After these incidents and the distress they caused, Plaintiff felt she had no choice but to change her career and course of study, switching from kinesiology to business.

COUNT I – Sexual Harassment in Violation of 42 U.S.C. § 2000e, *et seq.*

36. Plaintiff realleges and incorporates by reference Paragraphs 1–35 as though fully set forth herein.

37. Plaintiff was subjected to unwelcome harassment of a sexual nature by her supervisor, including repeated sexualized questioning, rumors regarding her sexual conduct, and intrusive inquiries unrelated to her job duties.

38. The harassment was severe and pervasive and altered the terms and conditions of Plaintiff's employment.

39. The harassment was perpetrated by Plaintiff's direct supervisor, who had authority over her employment.

40. Defendant knew or should have known of the harassment but failed to take prompt and appropriate corrective action.

41. As a direct and proximate result of Defendant's conduct, Plaintiff suffered emotional distress, lost wages, and other damages.

COUNT II – Retaliation for Opposing Sexual Harassment in Violation of 42 U.S.C. § 2000e-3

42. Plaintiff realleges and incorporates by reference Paragraphs 1–35 as though fully set forth herein.

43. Plaintiff engaged in protected activity when she objected to her supervisor's sexual inquiries and informed management that the conduct made her uncomfortable.

44. Plaintiff further engaged in protected activity when she informed management that she intended to file a formal complaint with human resources regarding the sexual harassment.

45. Defendant terminated Plaintiff's employment minutes after she engaged in this protected activity.

46. Defendant's stated reason for termination was pretextual.

47. There is a direct causal connection between Plaintiff's protected opposition to unlawful harassment and her termination.

48. As a result of Defendant's retaliatory conduct, Plaintiff suffered lost wages, emotional distress, and other damages.

COUNT III - Violation of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq.*

49. Plaintiff realleges and incorporates by reference Paragraphs 1–35 as though fully set forth herein.

50. During Plaintiff's employment, the Facility had an agreement with trainers pursuant to which, if a trainer provided a free training session to a gym member and, based on that session, the member signed up for ongoing training with that trainer, the trainer would receive a ten percent (10%) commission of the downpayment the member paid.

51. In June 2024, Plaintiff provided a free training session to a member, after which the member signed up for ongoing training with Plaintiff.

52. The member paid a downpayment of approximately $1,500, meaning Plaintiff was entitled to a commission of approximately $150 pursuant to the Facility's commission agreement.

53. The day Allen returned from leave in June 2024, he demanded that Plaintiff sign over the commission she would have earned.

54. Intimidated by Allen in light of his recent violent altercation and position of authority, Plaintiff signed over the commission to Allen as demanded.

55. Plaintiff's commission constituted earned wages under Illinois law.

56. Defendant failed and refused to pay Plaintiff the earned commission.

57. Defendant's failure to pay Plaintiff her earned commission was willful and without legal justification.

58. As a direct and proximate result of Defendant's conduct, Plaintiff suffered economic damages and other losses.

COUNT IV - Breach of Contract Under Illinois Common Law

59. Plaintiff realleges and incorporates by reference Paragraphs 1–35 and Paragraphs 50–58 as though fully set forth herein.

60. At all relevant times, Defendant maintained a compensation agreement and policy governing personal trainers' commissions.

61. Pursuant to that agreement, when a trainer provided a free training session to a gym member and the member subsequently purchased ongoing training with that trainer, the trainer would receive a commission equal to ten percent (10%) of the member's downpayment.

62. This commission structure constituted a valid and enforceable contract between Plaintiff and Defendant, supported by adequate consideration, including Plaintiff's provision of training services, client acquisition, and performance of her job duties.

63. Plaintiff fully performed her contractual obligations by providing a free training session to a gym member who, as a direct result of Plaintiff's services, enrolled in ongoing training and paid a downpayment of approximately $1,500.

64. Under the terms of Defendant's commission agreement, Plaintiff thereby earned a commission of approximately $150.

65. Instead of paying Plaintiff the commission she had earned, Defendant, through Allen acting within the scope of his authority, demanded that Plaintiff sign over the commission to him.

66. Due to Allen's position of authority and intimidating conduct, Plaintiff relinquished the commission she was contractually entitled to receive.

67. Defendant failed and refused to pay Plaintiff the earned commission in accordance with the agreed-upon compensation terms.

68. Defendant's failure to pay Plaintiff her earned commission constitutes a material breach of the parties' compensation agreement.

69. As a direct and proximate result of Defendant's breach, Plaintiff has suffered damages, including but not limited to unpaid compensation, financial losses, and related consequential damages.

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendant for:

a. Compensatory damages;

b. Punitive Damages;

c. Backpay;

d. Unpaid wages plus interest pursuant to Illinois law;

e. Statutory damages;

f. Attorneys' fees and costs; and

g. All other relief this Court deems just and proper.

*Web Arnold*

_____
Tad Weber Arnold of the Law Offices
of Goldman & Ehrlich, Chtd., as
Attorney for Plaintiff

Jonathan C. Goldman
Tad Weber Arnold
Law Offices of Goldman & Ehrlich, Chtd.
53 W. Jackson Blvd., Suite 815
Chicago, IL 60604
(312) 332-6733
jon@goldmanehrlich.com
web@goldmanehrlich.com